**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

|  |  |  |
|---|---|---|
| DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; and LEON PHILLIPS, | § § § § § § § | |
| | § | Civil Action No. 3:22-cv-00117-JVB |
| *Plaintiffs*, | § | |
| v. | § | |
| | § | |
| | § | |
| GALVESTON COUNTY; HONORABLE MARK HENRY, in his official capacity as Galveston County Judge; DWIGHT D. SULLIVAN, in his official capacity as Galveston County Clerk; | § § § § § § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston League of United Latin American Citizens ("LULAC") Council 151, Edna Courville, Joe A. Compian, and Leon Phillips and file this Complaint seeking declaratory and injunctive relief pursuant to the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the United States Constitution. In support of such relief, Plaintiffs respectfully show the Court as follows:

**I.**
**INTRODUCTION**

Galveston County has a long and continued history of racial discrimination and tension. The 2021 redistricting of the Galveston County Commissioners Court ("Commissioners Court") precincts unfortunately represents an extension of these problems.

Last decade, the Commissioners Court attempted to redraw its precincts in order to eliminate a performing minority opportunity commissioner precinct. The U.S. Department of Justice ("DOJ") objected to that proposed map during the preclearance process, finding that Galveston County had not met its burden of showing that its proposed map was adopted with no discriminatory purpose where it would have reduced minority Citizen Voting Age Population in Precincts 3 and 1. The Commissioners Court revised that map in 2012 to maintain that minority opportunity precinct, Precinct 3, and the DOJ did not object. The DOJ maintained objections to the Commissioners Courts' proposed removal of the precincts for constables and justices of the peace ("JPs") in which Black and Latino candidates had been elected. But after the *Shelby County v. Holder* Supreme Court decision in 2013, the Commissioners Court successfully reduced the number of precincts for constables and JPs from eight to four, eliminating two minority opportunity precincts and destroying those minority candidates' ability to be elected. Litigation remains ongoing over that 2013 change. *See Petteway v. Galveston*, CV 3:13-308 (S.D. Tex. 2013).

On November 12, 2021, the Commissioners Court adopted a new map which eliminates Precinct 3, the only precinct where Black and Latino residents of Galveston County could elect the candidate of their choice, Precinct 3 Commissioner Stephen Holmes. This racially discriminatory map was the result of a redistricting process that largely took place behind closed doors, without publicly adopted redistricting criteria, and with little public explanation of the rationale in proposing and adopting this map. The Galveston County Commissioners Court provided only one public hearing on its map proposals, with minimal notice of the hearing. At that hearing, Black and Latino residents from Galveston County quickly mobilized and showed up in force to voice their overwhelming opposition to the proposed elimination of the one performing minority-opportunity precinct. Despite this input, and over the objections of its sole minority

commissioner, the Court adopted a map which eliminates the only performing minority precinct, thereby entrenching a 5 to 0 Anglo majority on the Commissioners Court, even though the County is approximately 45% non-Anglo.

In the context of the County's previous redistricting issues as well as the current demographic and socio-economic conditions in the region, the 2021 Commissioners Court redistricting bears the indicia of intentional racial discrimination and has the effect of depriving minority groups in Galveston County of an equal ability to participate in the political process and elect candidates of their choice.

## II.
## JURISDICTION AND VENUE

1.      This is a civil and constitutional rights action arising under 42 U.S.C. § 1983, the First and Fourteenth Amendment to the United States Constitution, and the Voting Rights Act of 1965. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343 and 52 U.S.C. § 10101(d).

2.      Venue is proper in this Court under 28 U.S.C. § 1391 because some of the parties, including at least one of the Defendants, reside in this District, and a substantial part of the events giving rise to the claims in this case occurred in this District.

## III.
## PARTIES

**A.      Plaintiffs**

3.      The Mainland Branch NAACP, Dickinson Bay Area Branch NAACP, and Galveston Branch NAACP (together, the "County NAACP Branches") are nonprofit, nonpartisan membership organizations serving Galveston County. The County NAACP Branches are affiliate branches of the Texas State Conference of the NAACP ("Texas NAACP"). Members of the

3

County NAACP Branches live across Galveston County in all four precincts of the Commissioners Court and include Black and Latino people. The Black and Latino members of the County NAACP Branches face the immediate injury of being cracked across all four commissioners precincts and having no representative on the Commissioners Court.

4.     The mission of the County NAACP Branches is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination. In furtherance of this mission, the County NAACP Branches advocate to ensure that the interests of communities of color are represented on local, state, and national legislative bodies by representatives who share the communities' interests, values, and beliefs and who will be accountable to those communities.

5.     Specifically, the County NAACP Branches organize and participate in voter registration drives, voter education events, poll watcher programs, and get-out-the-vote campaigns that predominantly serve the minority populations of the cities of Galveston, Texas City, La Marque, Hitchcock, Dickinson, and League City in Galveston County.

6.     The Branches also participate in advocating for fair housing, natural disaster relief, fair policing, education, and public health services. For example, the Galveston Branch NAACP often serves as a liaison for members facing eviction and has helped organize COVID vaccination clinics. The Mainland Branch NAACP worked with other organizations and agencies to coordinate home visits and other relief efforts after Hurricane Harvey and Texas's historic freeze in February 2021, as well as providing COVID-related housing programs. The Dickinson Bay Area Branch NAACP also coordinated hurricane relief efforts and, in 2019 and 2020, ran a program educating members about home ownership.

7.     In addition to overcoming historical discrimination against Black and Latino voters in the state, and securing access to the ballot for its members, the County NAACP Branches are also concerned with ensuring that the voting strength of minority voters is not unfairly diluted by election structures that, in the presence of continued racially polarized voting, prevent minority voters from electing representatives of choice. As a natural outgrowth of obtaining fair representation, the County NAACP Branches have the goal of ensuring that minority voters have an equal opportunity to participate in elections for the Commissioners Court and to eliminate discrimination on the basis of race in voting and elections in Galveston County.

8.     The County NAACP Branches have standing to bring this action because their members would otherwise have standing to sue in their own right; the interests of fair and equal representation that it seeks to protect are germane to the organization's purpose; and due to the nature of this case, neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. For example, former Dickinson Bay Area NAACP Branch President Kimberly N. Yancy is a member of her branch who lives in Commissioner Precinct 2 under the enacted map and Commissioner Precinct 3 under the prior benchmark map. Galveston NAACP Branch President Mary Patrick is a member of her branch who lives in Commissioner Precinct 4 under the enacted map and Commissioner Precinct 3 under the prior benchmark map. Mainland NAACP Branch President Barbara Rice Anders is a member of her branch who lives in Commissioner Precinct 2 under the enacted map and Commissioner Precinct 3 under the prior benchmark map. All three individuals are registered voters who have previously voted for Commissioner Holmes in Precinct 3, intend to vote for Commissioner in the future, and as a result of the adoption of the enacted plan, no longer have an equal opportunity to elect their candidates of choice for Commissioners Court.

9.      The County NAACP Branches have standing to bring this action also because the County's adopted redistricting plan has impaired and will continue to impair its ability to promote electoral participation and eliminate discrimination on the basis of race in Galveston County. The County NAACP Branches work to ensure the political, educational, social, and economic equality of people of color, and African Americans in particular, in order to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights, among other goals. To further these goals, the County NAACP units regularly engage in efforts to register and educate voters of color and to encourage people of color, and African Americans in particular, to engage in the political process. But these efforts, and the mission and goals of the County NAACP Branches, are directly frustrated by the Galveston Commissioners Court precinct map enacted in 2021, which has unlawfully diluted and diminished the voting power of Galveston's Black and Latino voters and dismantled the only Commissioner precinct that was responsive to Black and Latino voters and the voting power of Galveston's Black and Latino community. As a result of the unlawful map enacted in 2021 for Galveston's Commissioners Court, the County NAACP Branches will have to divert resources toward education, outreach, and other activities that will promote the political equality for Black and Latino voters to counteract the diminished and diluted voting power of their member communities.

10.     Put another way, the 2021 Commissioners Court precinct map dilutes the votes of Galveston's Black and Latino residents such that it renders the Commissioners Court non-responsive to these communities, thereby detracting and diminishing the County NAACP Branches' civic engagement efforts and requiring the County NAACP Branches to expend more resources and fundamentally alter how they will advocate for the communities they represent.

11.     Galveston LULAC Council 151 is an independent unit of the national organization League of United Latin American Citizens ("LULAC"), the largest and oldest Latino organization in the United States. LULAC advances the economic condition, educational attainment, political influence, housing, health and civil rights of Latino Americans through community-based programs operating at more than 1,000 LULAC councils nationwide, including Galveston LULAC Council 151.

12.     Galveston LULAC Council 151 was founded in 1949 and currently has over 100 members. The Black and Latino members of Galveston LULAC Council 151 live across Galveston County in all four commissioner precincts. They face the immediate injury of being cracked across all four commissioner precincts and having no representative on the Commissioners Court.

13.     Galveston LULAC Council 151 regularly organizes voter registration events, hosts cultural events and fundraisers for educational scholarships, participates in community-wide charity events with other organizations such as the County NAACP Branches, and receives and addresses calls and complaints of racial discrimination. Its president also serves on several governmental and non-governmental boards and committees as a representative of Galveston LULAC Council 151.

14.     Galveston LULAC Council 151 has standing to bring this action because its members would otherwise have standing to sue in their own right; the interests of fair and equal representation that it seeks to protect are germane to the organization's purpose; and due to the nature of this case, neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

15.     Galveston LULAC Council 151 also has standing to bring this action because the County's adopted redistricting plan has impaired and will continue to impair its ability to promote

political influence of Latinos in Galveston County. To further its goals of advancing the economic condition, educational attainment, political influence, housing, health and civil rights of Latino residents of the County, Galveston LULAC Council 151 regularly engages in efforts to promote civic engagement, including registering to vote and voting, by its members and Galveston's greater Latino community. The unlawful vote dilution caused by the Galveston Commissioners Court precincts enacted in 2021 for Latino voters directly frustrates these goals and impairs these efforts. As a result, Galveston LULAC Council 151 will have to divert resources toward education, outreach, and other activities that will advance the economic condition, educational attainment, political influence, housing, health and civil rights of Latino residents of the County to counteract the diminished and diluted voting power of their member communities.

16.     Put another way, the 2021 Commissioners Court precinct map dilutes the votes of Galveston's Latino residents such that it renders the Commissioners Court non-responsive to these communities, thereby detracting and diminishing Galveston LULAC Council 151's civic engagement efforts and requiring it to expend more resources and fundamentally alter how it will advocate for the communities it represents.

17.     Joe A. Compian is a Latino resident of Galveston County. He is a member of Galveston LULAC Council 151. He resides on DuRoux Road in La Marque, TX, which sat in Commissioner Precinct 3 under the prior Commissioners Court plan. Under the enacted plan, he now resides in Commissioner Precinct 1. Mr. Compian is a registered voter who has regularly voted for Commissioner Stephen Holmes and other Black and/or Latino candidates-of-choice in the past. He intends to vote in the Precinct 1 Commissioners Court election in the future. As a result of the adoption of the enacted plan, Mr. Compian no longer has an equal opportunity to elect his candidate of choice for Commissioners Court.

18.     Edna Courville is an African American resident of Galveston County. She is a member of the Mainland Branch NAACP. She resides on Oriole Street in Texas City, TX, which sat in Commissioner Precinct 3 under the prior Commissioners Court plan. Under the enacted plan, she now resides in Commissioner Precinct 4. Ms. Courville is a registered voter who has regularly voted for Commissioner Stephen Holmes and other African American and/or Latino candidates-of-choice in the past. She intends to vote in the Precinct 4 Commissioners Court election in the future. As a result of the adoption of the enacted plan, Ms. Courville no longer has an equal opportunity to elect her candidate of choice for Commissioners Court.

19.     Leon Phillips is an African American resident of Galveston County. He is a member of the Galveston Branch NAACP. He resides on 38th Street in Galveston, TX, which sat in Commissioner Precinct 3 under the prior Commissioners Court plan. Under the enacted plan, he now resides in Commissioner Precinct 2. Mr. Phillips is a registered voter who has regularly voted for Commissioner Stephen Holmes and other African American and/or Latino candidates-of-choice in the past. He intends to vote in the Precinct 2 Commissioners Court election in the future. As a result of the adoption of the enacted plan, Mr. Phillips no longer has an equal opportunity to elect his candidate of choice for Commissioners Court.

**B.    Defendants**

20.     Defendant Galveston County is a political subdivision of the State of Texas governed by a five-member Commissioners Court comprised of four County Commissioners elected by geographical precinct and one County Judge elected by the county as a whole. Galveston County, Texas may be served by service upon Mark Henry, County Judge at 722 1st Street, Galveston, Texas 77550.

21.     Defendant the Honorable Mark Henry is County Judge of Galveston County and the chief officer of Galveston County. Defendant Henry is sued in his official capacity as the Chief Officer of Galveston County. Defendant Henry may be served at 722 1st Street, Galveston, Texas 77550.

22.     Defendant Dwight D. Sullivan is the County Clerk of Galveston County and has primary responsibility for administering elections in Galveston County, including elections for Commissioners Court. Defendant Sullivan may be served at 600 59th Street, Suite 2001, Galveston, TX 77551.

## IV.
## FACTUAL BACKGROUND

**A.     Galveston County Commissioners Court**

23.     Galveston County is governed by a County Commissioners Court comprised of four commissioners representing precincts and one County Judge elected countywide. As of 2021, the five members of the Court are: Defendant County Judge Henry, the presiding officer; Precinct 1 Commissioner Darrell Apffel; Precinct 2 Commissioner Joe Giusti; Precinct 3 Commissioner Stephen Holmes; and Precinct 4 Commissioner Robin Armstrong, who was appointed by the Court as Commissioner on May 17, 2022 in the wake of the passing of longtime Precinct 4 Commissioner Ken Clark.

24.     The Commissioners Court is the governmental body responsible for drawing and enacting the boundaries of the four commissioners precincts and the constable/JP precincts. Tex. Const. art. V §18 (a)-(b).

25.     Commissioner Holmes has long been the lone African American on the Galveston County Commissioners Court; the other members of the Court had all been Anglo during

Commissioner Holmes's tenure, though the recently-appointed Commissioner Armstrong is African American.

26.     Galveston's first Black County Commissioner, Wayne Johnson, was elected in 1988 and served until his passing in 1999, when Commissioner Holmes was first appointed to the Commissioners Court.

27.     Commissioner Holmes has since been elected to four terms as Precinct 3 County Commissioner.

28.     Precinct 3 has long been the sole precinct to be majority non-Anglo and to elect the candidate of choice of Black and Latino residents.

29.     Upon information and belief, only one Latino person has ever been elected to the Galveston County Commissioners Court.

30.     Commissioners precincts must abide by the one-person one-vote requirement of the U.S. Constitution, as well as all other provisions of the U.S. Constitution and Voting Rights Act.

31.     Generally, commissioners precincts must be redistricted the year following a decennial U.S. Census if the Census data shows a 10% or greater deviation between the populations of the largest and smallest precincts, though counties may undertake redistricting at other times as well.

**B.     Recent History of Commissioners Court Redistricting**

32.     In the 2011 redistricting cycle, Precinct 3 was the subject of significant litigation under the preclearance regime of Section 5 of the Voting Rights Act.

33.     Under Section 5 of the Voting Rights Act, covered jurisdictions are required to demonstrate before either the U.S. District Court for the District of Columbia or the U.S. Attorney

General that a new redistricting plan "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. . . ." 52 U.S.C. § 10304(a).

34.     The State of Texas, including Galveston County, was a covered jurisdiction subject to Section 5's preclearance requirement under a coverage formula held unconstitutional by the U.S. Supreme Court's ruling in *Shelby County v. Holder*, 570 U.S. 529 (2013).

35.     After the 2010 Census, the Galveston Commissioners Court submitted Commissioners Court maps to the DOJ that would have reduced the populations of racial minorities in Precincts 1 and 3, then represented by Patrick Doyle, who is Anglo, and Holmes, who is Black.

36.     The Commissioners Court also sought to halve the number of justices of the peace ("JPs") and constables from eight to four in a manner that made it more difficult for Black and Latino constables and JPs to be reelected.

37.     At the time, Defendant Henry had recently been elected County Judge, and Precinct 3 Commissioner Holmes and Precinct 4 Commissioner Clark had served on the Court for over a decade.

38.     In a letter dated March 5, 2012, the DOJ objected to the changes to both the Commissioners Court and constable/JP maps. The DOJ considered the following to be indicative of the Commissioners Court's discriminatory purpose in redistricting: (1) "the county's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the county would be guided in the redistricting process"; (2) "deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct" (Precinct 3 Commissioner Holmes); and (3) the pretextual inclusion of the largely white Bolivar Peninsula in Precinct 3, which would "lead to a concomitant loss of the ability of

minority voters to elect a candidate of choice" due to racially polarized voting and would constitute retrogression.[1]

39.     On March 22, 2012, the Commissioners Court formally adopted a 2012 redistricting plan for commissioners precincts that preserved Precinct 3 but not Precinct 1. The DOJ did not object to that plan but maintained its objection to the constable/JP map. The proposed Commissioner plan therefore went into effect, while the eight constables and JPs would continue to be elected under the precleared 2002 map.

40.     After the U.S. Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), relieved the County of the need to undergo DOJ preclearance for voting changes, the Commissioners Court held a special redistricting meeting in August 2013 and voted 4-1 along racial lines (with Holmes being the remaining non-Anglo Commissioner and lone dissenter) to reduce the number of precincts for constables and JPs from eight to four. Holmes was not included in the discussion leading up to the adoption of the constable/JP map.

**C.     The 2021 Commissioners Court Redistricting**

41.     The 2020 U.S. Census data used in redistricting was released on August 16, 2021.

42.     According to the 2020 U.S. Census, Galveston County has a population of 350,682 as of 2020, an increase of 59,373, or 20%, from its 2010 population of 291,309. The racial makeup of the County as of 2020 is 54.6% non-Hispanic white (Anglo) alone, 25.3% Hispanic, 12.3% Black, 3.61% two or more races, 3.5% Asian, and 0.4% Native American or Native Hawaiian.

43.     Like in many other counties in Texas, the proportion of residents identifying as non-Hispanic white (Anglo) shrank in the last decade, from 59.3% in 2010 to 54.6% in 2020, while the Hispanic population grew from 22.4% to 25.3%.

---

[1] *See* Letter from Thomas E. Perez to James E. Trainor III, March 5, 2012 (Attachment 1), accessed at https://www.justice.gov/crt/case-document/file/925636/download.

44.     According to the 2020 U.S. Census, the Galveston County Commissioners Court was clearly malapportioned, with a deviation as large as 17.9% between the largest and smallest precincts.

45.     The following table ("Table 1") provides the approximate demographics of each commissioners precinct prior to 2021 redistricting ("benchmark precincts"), based on the 2020 U.S. Census data for total population and including an estimation of Citizen Voting Age Population ("CVAP") by race based on 2019 American Community Survey ("ACS") data, which was the most recent data available at the time of the Commissioners Court redistricting.

| Benchmark Precincts in 2020 | Population | Deviation | % Deviation | % White Alone CVAP | % Hispanic CVAP | % Black CVAP | % Asian CVAP |
|---|---|---|---|---|---|---|---|
| 1 | 85,408 | -2,263 | -2.6% | 66.9% | 20.3% | 8.5% | 3.2% |
| 2 | 95,596 | 7,925 | 9.0% | 72.2% | 15.8% | 8.2% | 2.7% |
| 3 | 79,931 | -7,740 | -8.8% | 42.3% | 22.3% | 32.4% | 1.8% |
| 4 | 89,747 | 2,076 | 2.4% | 72.8% | 15.1% | 6.0% | 5.1% |

Table 1

46.     In anticipation of the data release and the need to complete redistricting in a timely manner, many other counties in Texas hired outside counsel to provide demographic, mapping, and legal analyses; adopted timelines and criteria to guide redistricting; and scheduled public hearings to obtain community input.

47.     As early as January 2021, the Galveston Commissioners Court had considered hiring Holtzman Vogel Baran Torchinsky & Josefiak PLLC ("Holtzman Vogel") and the attorney Dale Oldham to assist with redistricting the commissioners precincts. After approval by the Commissioners Court, with Commissioner Holmes casting the lone dissenting vote, Defendant

County Judge Henry signed the agreement to engage Holtzman Vogel and Oldham on April 4, 2021. But no attorneys from those firms testified in public Commissioners Court meetings to present a demographic, mapping, or legal assessment.

48.     As in 2012, the Commissioners Court did not publicly discuss or adopt any redistricting criteria or adopt any timeline by which to adopt proposed maps. The Court had adopted redistricting criteria and timelines in the 1991 and 2001 redistricting cycles.

49.     As in 2012, the County did not include Commissioner Holmes in its redistricting plans. He was not provided with complete data for the eventual proposed plans and was not made privy to the decision to post the eventual proposed plans on the County's website.

50.     Only in late September or early October 2021 did the County's retained redistricting consultant, Oldham, contact Commissioner Holmes about potential redistricting maps.

51.     Due to the lack of information and transparency about the County's redistricting process, the League of Women Voters and Plaintiffs' counsel the Texas Civil Rights Project sent a letter by e-mail to the members of the Court on October 29, 2021, outlining requirements for an inclusive redistricting process, including a sufficient timeline, opportunity for public testimony, and transparency.

52.     On or about the date the letter was sent, the County posted a redistricting webpage with interactive versions of two proposed maps that stated: "The Galveston County Commissioners Court will be discussing and voting to redistrict county commissioner's precincts in the next few weeks. Below are the two proposed maps that will be considered. Public comment is now open for county residents via the form on this page." As of the date of filing, the page remains online: https://www.galvestoncountytx.gov/our-county/county-judge/redistricting.

53.     Despite repeated requests by members of Plaintiff organizations for information on redistricting, this was the first time they had access to any proposed precinct maps. Commissioner Holmes and his staff typically serve as the source of information about County government for members of the African American and Latino communities, but because he was shut out of the process by other Commissioners, he was unable to provide information to Plaintiffs or other constituents.

54.     No demographic or other information about the maps was made publicly available on the County's redistricting webpage or otherwise.

55.     Map Proposal 1 left the majority minority Precinct 3 intact, so that it still covered parts of La Marque, Texas City, Dickinson, and Galveston (with larger minority populations), but added the Bolivar Peninsula, which has a predominantly Anglo population.

56.     The image of Map Proposal 1 posted on the County's redistricting page is reproduced below:



57.     The  following  table  ("Table  2")  provides  the  approximate  demographics  of

Proposal 1 using 2019 ACS data to estimate CVAP by race:

| Proposal 1 Precincts | Population | Deviation | % Deviation | % White Alone CVAP | % Hispanic CVAP | % Black CVAP | % Asian CVAP |
|---|---|---|---|---|---|---|---|
| 1 | 87,659 | -12 | 0.0% | 66.9% | 20.2% | 8.7% | 3.2% |
| 2 | 86,431 | -1,240 | -1.4% | 72.9% | 15.5% | 7.7% | 2.8% |
| 3 | 88,633 | 962 | 1.1% | 44.7% | 22.3% | 30.0% | 1.8% |
| 4 | 87,959 | 288 | .3% | 73.2% | 14.6% | 6.1% | 5.2% |

Table 2

58.     Map Proposal 1 resembles the County's 2012 proposal to which the DOJ objected

because the Bolivar Peninsula's predominantly Anglo population dilutes the voting power of racial

minorities in Precinct 3, but it would still at least have maintained Precinct 3 as a majority-minority precinct.

59.     By contrast, Map Proposal 2 completely altered the benchmark map, moving proposed Precinct 3 to a concentrated population in the northwest of the County to cover predominantly Anglo parts of League City and Friendswood and maintaining only a small area of the city of Dickinson from the benchmark Precinct 3 boundaries.

60.     Map Proposal 2 divided the majority of the benchmark Precinct 3's Black and Latino residents among proposed Precincts 1, 2, and 4. The cities of La Marque and Texas City were divided among Precincts 1, 2, and 4. Portions of League City and Dickinson were moved to Precinct 1.

61.     Map Proposal 2 also split voting precinct 336, which has the highest Black population and CVAP in the County—67.2% of the total population of voting precinct 336 as of 2020 is Black—and has been part of Commissioner Precinct 3 for over 20 years. Map Proposal 2 split voting precinct 336 between Precincts 1 and 4.

62.      The image of Map Proposal 2 posted on the County's redistricting page is reproduced below:



63.     Map Proposal 2 rendered all four precincts predominantly Anglo.

64.     The following table ("Table 3") provides the approximate demographics of

Proposal 2 using 2019 ACS data to estimate CVAP by race:

| Proposal 2 Precincts | Population | Deviation | % Deviation | % White Alone CVAP | % Hispanic CVAP | % Black CVAP | % Asian CVAP |
|---|---|---|---|---|---|---|---|
| 1 | 87,689 | 18 | 0.0% | 64.1% | 20.6% | 11.1% | 3.0% |
| 2 | 87,697 | 26 | 0.0% | 63.2% | 19.3% | 14.9% | 1.7% |
| 3 | 88,111 | 440 | 0.5% | 67.0% | 18.1% | 8.8% | 5.3% |
| 4 | 87,185 | -486 | -.6% | 62.2% | 14.6% | 18.8% | 3.0% |

Table 3

19

65.     These changes were not necessary to resolve malapportionment under the previous plan, as the populations could have been rebalanced by shifting a single voting precinct from Precinct 2 to Precinct 3. Furthermore, the Latino and Black CVAP would remain a majority in such a revised Precinct 3 even after shifting this single voting precinct from Precinct 2 to Precinct 3 to balance total populations between precincts.

66.     The County's redistricting webpage did not specify the time and date of the public hearing on the maps.

67.     On November 9, 2021, the Commissioners Court provided only the statutorily required 72 hours of notice and published an agenda for a special meeting on November 12, 2021 that included the item "Consideration of an order establishing new commissioners precinct boundaries."[2]

68.     In previous years of redistricting, the Commissioners Court held multiple public meetings that began at 6:00 p.m. or later.

69.     On Friday, November 12, 2021, the day before the candidate filing period opened, the Court held a public meeting at 1:30 p.m. in the small North County Annex building in League City, not the larger Galveston County Courthouse in the county seat in the City of Galveston.

70.     The regular Galveston County Courthouse meeting room can seat approximately 250 people, with the option to add more seats or accommodate standing room, and the parking garage can fit approximately 400-500 vehicles. The Galveston County Courthouse also has a built-in sound system with a microphone for each individual Commissioner, unlike the North County Annex building.

---

[2] Agenda meeting minutes found on Galveston Commissioners Court website: http://agenda.galvestoncountytx.gov/sirepub/cache/2/ddr5ugawoh5un03jp0agnr5l/264104122022102128294.htm.

71.     The Galveston County Courthouse location was available for use, and no reason was provided to the public as to why the annex building was used in lieu of the regular meeting place.

72.     The 1:30 pm timing of the meeting made it difficult or impossible for people with work or school responsibilities to attend the meeting. This was the only public hearing on redistricting held by the Commissioners Court.

73.     All of the Commissioners Court members except Precinct 4 Commissioner Ken Clark were in attendance.

74.     Approximately 150 to 200 people attended the meeting, crowding into the North County Annex building's meeting room, which could only seat approximately 70 people.

75.     More than 40 community members, including members of the County NAACP Branches such as Plaintiffs Courville and Phillips, spoke at the meeting, criticizing the redistricting process and the racially discriminatory effect of the two map proposals. Several brought signs criticizing the maps as discriminatory.

76.     Many members of the public heard about the hearing only through word of mouth or social media due to the efforts of community members and organizations, including the County NAACP Branches.

77.     Many members of Plaintiff organizations and other civically engaged members of the African American and Latino communities, including Plaintiff Compian, were unable to attend due to the time, location, and inadequate notice of the meeting.

78.     Members of the public reported having difficulty accessing or parking at the North County Annex building due to construction in the building's parking lot.

79.     Accessibility issues continued inside the building, where members of the public, overcrowded in the small room, had to spill into the hallway, where no seating was provided, even for elderly or disabled attendees.

80.     The County Judge and Commissioners did not use microphones when speaking, and no microphones were provided for the public to provide comment, making it difficult for attendees to hear any statements.

81.     Many members of the public spoke in support of longtime Precinct 3 Commissioner Holmes and in opposition to eliminating Precinct 3 as a minority-opportunity precinct and the opaque, rushed process for proposing maps and soliciting public comment.

82.     Commissioner Holmes also spoke out against the injustice of the map proposals to the County's communities of color and its dilutive effect on voters of color.

83.     He specifically stated that "Precinct 3 is the only precinct in the county where minority voters have the ability to elect their candidate of choice, and is the only precinct currently represented by a minority commissioner. So, you know this is the same playbook that happened in 2012."[3]

84.     Commissioner Holmes offered two alternative precinct maps which would have complied with federal one-person one-vote standards while preserving Precinct 3 as a precinct in which non-Anglo voters could elect their candidate of choice for commissioner. The other commissioners refused to consider or vote on Commissioner Holmes's proposals.

---

[3] Galveston County Commissioners Court Special Meeting (Nov. 12, 2021), https://livestream.com/accounts/21068106/events/6315620/videos/227296657?origin=stream_live&mixpanel_id=15 5bc7a4b81353-090e1476be26ec-404c0628-140000-155bc7a4b821a6&acc_id=30028131&medium=email.

85.     On a 3-1 vote, with only Commissioner Holmes voting against, the Commissioners Court adopted Proposal 2, which completely rearranged the prior precincts and eliminated the only precinct that would perform for a coalition of minority voters.

86.     No Commissioner or the County Judge responded to allegations of racial discrimination at the hearing.

87.     No Commissioner or the County Judge explained why they preferred Map Proposal 2 over Map Proposal 1, which would have maintained Precinct 3 as a majority-minority precinct, at the hearing.

88.     No Commissioner or the County Judge elaborated at the hearing on a specific reason to adopt Map Proposal 2.

89.     The County Judge and Commissioners for Precincts 2 and 4 are up for re-election in 2022. Commissioners for Precincts 1 and 3 are up for re-election in 2024.

C.      **Racially Polarized Voting**

90.     As indicated above in Table 3, in the adopted Map Proposal 2, all four Commissioner precincts are majority Anglo CVAP.

91.     Alternative plans, including one with a district based upon the benchmark Precinct 3 with one voting precinct shifted from benchmark Precinct 2 to Precinct 3 for the purposes of balancing populations, can be drawn in which Black and Latino voters constitute a geographically compact majority of a single-member Commissioner precinct.

92.     According to statistical analyses of past elections, Black and Latino voters in Galveston County are politically cohesive and overwhelmingly support the same candidates both countywide and for the benchmark Precinct 3. According to preliminary Ecological Inference analysis, a significant and large majority of Black and Latino voters in benchmark Precinct 3

favored the same candidates in recent county and statewide elections. For example, a King's Iterative Ecological Inference analysis of countywide voting results from the 2020 general election indicates 95+% of Black voters and 80%+ of Latino voters support the same candidates. Upon information and belief, this same cohesive voting pattern is present both countywide and in benchmark Precinct 3 and is supported by the results of other general elections cycles as well.

93.    Those analyses also show that Anglo voters in Galveston County, including in the newly enacted Precincts 1, 2, and 4 that each now contain a portion of the benchmark Precinct 3, overwhelmingly vote for the same candidates as other Anglo voters and vote sufficiently as a bloc to defeat the Black- and Latino-preferred candidates in the newly enacted precincts. For example, a King's Iterative Ecological Inference analysis of county-wide voting results from the 2020 general election indicates that Anglo voters rejected the minority-preferred candidate and preferred the Anglo-preferred candidates at 90%+. These high rates of Anglo bloc voting that rejects the minority-preferred candidates exist both countywide and in each of the newly enacted precincts.

94.    Those analyses indicate that under the enacted map, Black and Latino voters will not be able to elect the candidate of their choice in any commissioner precinct.

95.    Because Black and Latino voters are also unable to elect a candidate of their choice to any countywide office, adopting Map Proposal 2 results in Black and Latino voters being unable to elect a candidate of choice to any Galveston County governmental office.

**D.    Context of Discrimination**

96.    The 2021 Commissioners Court redistricting arose out of a long history and context of racial discrimination in Galveston County, a mere sample of which is described below.

*Black and Latino residents in Galveston County continue to face barriers to success in electoral politics, including open racism.*

97.     Prior to successful challenges under the Voting Rights Act, local offices in Galveston County were elected countywide, and no Black candidate could win because the white majority refused to vote for them.

98.     After the passage of the Voting Rights Act in 1965, the first time a Black candidate was elected to the Galveston County Commissioners Court was in 1988.

99.     Similarly, since that time, only one Latino candidate has been elected to the County Commissioners Court, and none since the 1980s.

100.    The County was formerly covered by the Voting Rights Act's preclearance requirement. As discussed above, in the 2011 redistricting cycle, the DOJ objected to the Commissioners Court's redistricting plan for commissioners precincts that (1) did not rely on publicly adopted redistricting criteria, (2) failed to involve Commissioner Holmes in the mapping process, and (3) resulted in diluting the voting strength of Black and Latino residents in the County by adding the Bolivar Peninsula to Precinct 3. The DOJ also objected to the proposal to reduce the numbers of precincts for constables and JPs from eight to four.

101.    The County moved swiftly to implement voting changes after the preclearance requirement was rendered inoperative by the U.S. Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).

102.    Just months after the *Shelby* decision, in August 2013, the Commissioners Court held a special meeting to approve and implement the same constable JP map that the DOJ had objected to in 2012, thereby reducing the number of constable and JP precincts and also resulting in the election of fewer Black and Latino constables and JPs.

25

103.    In 2015, the City of Galveston, the county seat and second largest city in the County, also proposed to switch several of its City Council seats from districts to at-large elections, which would have resulted in fewer minority-supported members of Galveston City Council being elected. A group of community leaders, including the leaders of Plaintiffs the Galveston NAACP Branch and LULAC Council 151, advocated against that proposal, which ultimately did not take effect.[4]

104.    "The Great Poll Closure," a report from The Leadership Conference Education Fund, cited Galveston County as "an example of how voters of color are especially at risk of being disenfranchised without Section 5" of the Voting Rights Act. The report noted that seven polling places—16% of those in the county—closed in Galveston County following the *Shelby County* decision. Although Galveston was one of many counties to shift to vote centers, the report found that "Galveston's record of voting discrimination should put such changes under heightened scrutiny."[5]

105.    Upon information and belief, when Commissioner Holmes proposed several vote center locations in more concentrated minority communities prior to the November 2020 general election, his proposals were rejected.

106.    Upon information and belief, vote centers in predominantly minority communities were set to be eliminated during the 2022 election cycle had Commissioner Holmes not been on the Commissioners Court to advocate to keep them open.

---

[4] Cornelia Banks, Leon Phillips, Steve McIntyre, Joe Compian, Mary Patrick & Amy Quiroga, *Loss of voting rights proposed 46 days before Juneteenth*, Galveston County Daily News (June 4, 2015), https://www.galvnews.com/opinion/guest_columns/article_14649dbc-0a73-11e5-83d1-cbe852dab0ac.html.
[5] Scott Simpson, *The Great Poll Closure*, The Leadership Conference Education Fund (Nov. 2016), http://civilrightsdocs.info/pdf/reports/2016/poll-closure-report-web.pdf.

107.     Because of how the Texas Election Code regulates the number and placement of polling locations, the new Commissioners precinct maps will necessarily mean that Galveston Island, the historic center of the African American community, gets allocated fewer polling locations. Already this has been used by the County as an excuse to eliminate the *only* polling place in the historical African American "north of Broadway" section of Galveston Island in the May 2022 Galveston municipal elections.

108.     The County has also failed other obligations under the Voting Rights Act and the Help America Vote Act of 2002 ("HAVA"). In 2007, the County entered into a consent decree with the DOJ for failure to provide Spanish language assistance to voters in violation of the Voting Rights Act and HAVA.

109.     Plaintiff NAACP and its national parent organization have received numerous reports over multiple election cycles of voter intimidation at predominantly African American polling locations in the County.

110.     Galveston County Tax Assessor and Voter Registrar Cheryl Johnson has also been sued in her official capacity for taking actions targeting Latino voters.  According to 2019 lawsuits brought by LULAC and other organizations, the Galveston County Voter Registrar sent letters to more than 830 Galveston County residents, primarily Latinos, informing them they were suspected of being non-citizens and that they would be purged from voter rolls without affirmative proof of citizenship. *See Tex. League of United Latin Am. Citizens v. Whitley*, CV SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019). That litigation ended in a settlement agreement in which the letters were rescinded.[6]

---

[6]     Settlement   Agreement,   (Apr.   26,   2019),   https://campaignlegal.org/sites/default/files/2019-04/Agrmt%20all%20signatures.pdf.

111.     Racist comments and racial appeals have appeared in Galveston County area elections and politics.

112.     In the city of La Marque, which was previously almost entirely contained within Precinct 3 under the benchmark Commissioners Court map but was split into Precincts 1, 2, and 4 in the adopted Map Proposal 2, an Anglo member of the City Council was recorded in a conversation stating that a Black woman "got on the school board with the rest of the blacks and they all just ganged up and that's why the school system has gone to hell." The council member defended her comments and agreed that the condition of the school district was a "black-white issue."[7]

113.     Galveston County Republican Party Chairwoman Yolanda Waters came under fire in 2019 for a text message where she referred to a Black member of the Texas State Republican Executive Committee with a racial slur. Waters said she made an "unfortunate typo," and resisted calls to resign by Texas Governor Greg Abbott, Lieutenant Governor Dan Patrick, and Texas Republican Party Chairman James Dickey, among others.[8]

114.     In the 2020 race for Galveston County Tax Assessor, one candidate sent a mailer with a stock image of a Latino man with a tattooed face and tattooed bare chest, standing with arms crossed. The words accompanying the photo stated: "Texans can thank [incumbent] Cheryl Johnson for having illegal immigrants vote in this November's Election!"[9]

---

[7] Joel Eisenbaum, *Member of La Marque city council recorded making racist remarks*, Click2Houston.com (June 3, 2014, 7:19 pm), https://www.click2houston.com/news/2014/06/04/member-of-la-marque-city-council-recorded-making-racist-remarks/.

[8] Peter Svitek, *Top Texas Republicans pressure a county chair to resign over racist text*, The Texas Tribune (Dec. 7, 2019), https://www.texastribune.org/2019/12/07/texas-republicans-racist-text-resign/.

[9] John Wayne Ferguson, *Johnson: Peden ad 'racist,' 'discriminatory' and 'a lie'*, Galveston County Daily News (Feb. 22, 2020), https://www.galvnews.com/news/free/article_1f26ee77-55ca-5723-a493-28fdd78f15c5.html.

115.    Racial tensions have also flared in La Marque since mid-2021, when former Dickinson NAACP Branch president Kimberly Yancy won a runoff election to represent La Marque City Council District A and Keith Bell was elected to a full term as mayor. Both Yancy and Bell are Black. Both have been the target of attacks on social media and elsewhere that feature dog whistles and racial stereotyping.

116.    The Galveston County Democratic Party had long been chaired by an Anglo, and the appointment process to replace him was marked by racialized tension and comments.

_Black and Latino residents of Galveston County face continued socio-economic disparity, and political infrastructure issues, including housing and disaster relief, break down along racial lines._

117.    A 2013 study of the Houston-Galveston area by PolicyLink and the Program for Environmental and Regional Equity at the University of Southern California found that while "communities of color are driving the region's population growth and are essential to the region's economic success now and into the future," there are "wide racial gaps in income, health, and opportunity." The report found higher rates of poverty and working poverty for people of color, and noted that "at nearly every education level, Houston-Galveston's communities of color have worse economic outcomes than whites." The report further found that communities of color "are more likely to live in neighborhoods of concentrated poverty" and "have higher housing burdens," especially for renters. In addition, the report found that food deserts "are predominantly in people-of-color neighborhoods."[10]

118.    Galveston County Independent School District was under federal supervision for school desegregation from 1959 until 2009.

---

[10] PowerPoint Presentation: An Equity Profile of the Houston-Galveston Region, (June 6, 2013), https://dornsife.usc.edu/assets/sites/242/docs/Houston_6June2013_FINAL.pdf.

119.    A 2009 study by the University of Texas at Austin's Community and Regional Planning graduate school found that there is a correlation between a high concentration of racial minorities in a given location and that location's geographic vulnerability.[11] Thus, unsurprisingly, Black residents bore the brunt of the devastation of Hurricane Ike, a massive storm of 110 mile per hour winds and 11 foot storm surges across Galveston Island in September 2008, killing dozens of people in Texas, damaging or destroying thousands of homes, and leaving the city of Galveston temporarily uninhabitable.

120.    Most of Galveston's public housing units were damaged during Hurricane Ike. The city's public housing authority ordered the demolition of 569 units in all four public housing developments in the island's north side, displacing the mostly Black and Latino residents.

121.    Although mandated by state and federal law to replace those units and receiving hundreds of millions in federal disaster relief money partially earmarked for rebuilding those public housing developments, Galveston failed to move forward with its commitment to rebuild public housing units, sparking heated, racially charged debates about whether and where to rebuild public housing.

122.    Opponents of rebuilding public housing in accordance with the law were predominantly Anglo, and proponents were mostly Black and Latino. At least one meeting of 200 people over public housing rebuilding proposals in October 2009 erupted into a shouting match, in which local attorney Buddy Herz, who was in 2012 appointed to chair the city's housing

---

[11] Kevin Dancy, Esq., *Seizing the Opportunity for Equitable and Inclusive Redevelopment: Galveston's Trials After Hurricane Ike Offer Lessons for Other Communities*, Federal Reserve Bank of Dallas Community Development (Mar. 2018), https://www.dallasfed.org/-/media/Documents/cd/pubs/galveston.pdf?la=en.

commission by newly elected mayor Lewis Rosen, said he did not want high-density housing because "[i]t will just produce the same types of ghettos we had for the last 50 years."[12]

123.    Indeed, Galveston Mayor Rosen was elected in 2012 on an anti-public housing platform; his campaign website quoted him as saying, "My position on rebuilding public housing is very simple: Don't do it."[13]

124.    Galveston began rebuilding public housing in 2013, only after the DOJ threatened to revoke hundreds of millions of dollars in federal disaster relief.

125.    Almost a decade after Hurricane Ike, in 2018, less than half of that housing had been built.[14]

126.    In July 2021, Commissioner Holmes cast the lone dissenting vote when the four Anglo members of the Commissioners Court approved a resolution to support the controversial Interstate 45 North Highway project in Harris County, a large infrastructure project which has been paused amid an ongoing Federal Highway Administration investigation into civil rights complaints related to the project.[15]

---

[12] Leigh Jones, *Meeting on housing plan ends in shouting match*, Galveston County Daily News (Oct. 20, 2009), https://www.galvnews.com/news/article_e438383b-96da-57ee-a66e-1979283aa5c1.html.

[13] Forrest Wilder, *Galveston's Nasty Public Housing Fight*, Texas Observer (Apr. 5, 2012, 7:43 pm), https://www.texasobserver.org/galvestons-nasty-public-housing-fight/.

[14] Edgar Walters, *"It's our form of apartheid": How Galveston stalled public housing reconstruction in the 10 years after Ike*, The Texas Tribune (April 16, 2018), https://www.texastribune.org/2018/04/16/galveston-public-affordable-housing-hurricane-ike/.

[15] John Wayne Ferguson, *Galveston County commissioners voice support for embattled I-45 North project*, Galveston County Daily News (Jul. 27, 2021), https://www.galvnews.com/news/article_b676a75c-ff77-5712-8cc9-7c2d9546b293.html; Jishnu Nair, Jake Magee, *TxDOT commissioner optimistic about I-45 agreements*, Community Impact Newspaper (Feb. 17, 2022, 6:00 am), https://communityimpact.com/houston/bay-area/transportation/2022/02/17/txdot-commissioner-optimistic-about-i-45-agreements.

*Anglo-preferred candidates in Galveston County are less responsive than minority-preferred*
*candidates to the needs and interests of the African American and Latino communities.*

127.     Commissioner Holmes is a fixture in the African American and Latino communities throughout Galveston County. He and his staff attend the community and neighborhood events put on by Plaintiff organizations and other African American and Latino community organizations.

128.     Commissioner Holmes financially supports African American and Latino community organizations with charitable donations.

129.     Commissioner Holmes and his office also organize community events and charitable distributions which serve predominantly African American and Latino areas of the County.

130.     Commissioner Holmes in particular has served as a champion for free public and community services for senior citizens, which particularly benefit African American and Latino senior citizens because they often have to survive on lower, often fixed, incomes as compared to Anglos in the County.

131.     Commissioner Holmes serves as the primary source of information about County Government to Plaintiffs and other African American and Latino community organizations and individual residents in the County. This includes direct constituent services, helping connect residents to the appropriate government entities to resolve their issues, and helping them navigate the County government bureaucracy.

132.     Commissioner Holmes also nominates and supports African American and Latino candidates for public office, such as interim justice of the peace positions and county board appointments.

133.     Despite representing certain areas in the County that are predominantly non-Anglo, the other County Commissioners do not regularly participate in the community or neighborhood events of African American and Latino organizations.

134.     Many minority residents of Galveston County often reach out to Commissioner Holmes or his staff for help with constituent service needs and to navigate county bureaucracy, even if they reside in another Commissioner's precinct, because they find him and his office to be more responsive than other Commissioners.

135.     In addition to the specific issues detailed in this Complaint, Commissioner Holmes often is the only member of the Commissioners Court to vote in line with the wishes of a majority of the African American and Latino communities in the County on important votes.

*Discrimination persists in other issues concerning race, including immigration, policing, and Confederate history, in which Commissioner Holmes also cast dissenting votes against the Anglo members of the Commissioners Court.*

136.     The Commissioners Court has also spread misinformation and alarmist messaging about immigration issues, inflaming resentment against Latino residents, and diverted county resources away from Galveston's residents in order to bolster security at the U.S.-Mexico border, nearly 400 miles away.

137.     In June 2021, Galveston County Judge Mark Henry issued a disaster declaration related to "the crisis at the border" and signed an executive order (1) approving the use of federal American Rescue Plan Act funding (designed as economic stimulus during the COVID-19 pandemic) to send County law enforcement officers to travel to the border to assist with the influx of migrants, (2) dedicating up to 10% ($6.6 million) of the County's American Rescue Plan Act

funds for border wall construction, and (3) creating a task force to support the Texas Department of Public Safety at the border.[16]

138.    In July 2021, the Anglo Commissioners voted to approve Judge Henry's disaster declaration and approve the emergency spending for "border security measures." Commissioner Holmes cast the lone dissenting vote.[17]

139.    A report by the Galveston County Daily News found that the cities of Galveston, League City, Texas City, La Marque, and Hitchcock all had police departments the racial makeup of which was more Anglo than the city population as a whole.[18]

140.    Galveston police entered the national spotlight in 2019 after two Anglo officers on horseback were photographed leading a handcuffed Black man by a rope down a street. No charges were filed against the officers.

141.    In August 2019, the League City Police Department referred to Black individuals who allegedly committed a theft as "buffoonish" on its Facebook page.

---

[16] Daniela Sternitzky-Di Napoli, *Galveston County Judge Mark Henry issues disaster declaration citing border crisis*, Click2Houston.com (June 29, 2021, 12:53 pm), https://www.click2houston.com/news/local/2021/06/29/galveston-montgomery-county-judges-makes-announcement-on-border-security/; Alejando Serrano, *Galveston County Judge Mark Henry issues disaster declaration in response to border situation*, Houston Chronicle (June 29, 2021), https://www.houstonchronicle.com/news/houston-texas/houston/article/Galveston-County-Judge-Mark-Henry-issues-disaster-16282889.php.
[17] Agenda, (July 8, 2021 – 9:00 am), https://www.galvestontx.gov/AgendaCenter/ViewFile/Agenda/_07082021-3969?html=true; John Wayne Ferguson, *Commissioners uphold Galveston County judge's immigration disaster order*, Galveston County Daily News (July 2, 2021), https://www.galvnews.com/news/article_ea6590ca-7219-528f-9bfd-81133de57ef4.html.
[18] Matt Degrood, *Galveston County law enforcement works on diversity*, Galveston County Daily News (July 17, 2020), https://www.galvnews.com/news/police/free/article_036c2431-b464-5eee-aad4-5164645122ae.html.

142.    In 2021, when the four Anglo members of the Commissioners Court voted to pass a resolution calling upon state lawmakers to increase punishment of juvenile offenders in extreme cases to life sentences, Commissioner Holmes cast the lone vote against it.[19]

143.    Despite Galveston being the birthplace of the nationally celebrated and federally recognized Juneteenth holiday, commemorating the day in 1865 when a Union army general read and enforced an order in Galveston freeing enslaved people, the Commissioners Court decided in 2020 not to remove the Confederate monument in front of the Galveston County Courthouse, despite attempts by local Black activists and Commissioner Holmes to have it removed.[20]

144.    The statue, erected in 1911 and named "Dignified Resignation," depicts a man holding a Confederate flag over his left shoulder and a broken sword in his right hand. Behind him is a dismantled cannon. At his feet is a scroll that states: "GLORY TO THE DEFEATED." A plaque on the statue read, "There has never been an armed force which in purity of motives, intensity of courage and heroism has equaled the Army and Navy of the Confederate States of America."[21]

145.    Commissioner Holmes placed the removal of the Confederate monument on the Commissioners Court agenda for its August 24, 2020 meeting. Like the November 12, 2021

---

[19] John Wayne Ferguson, *After Supreme Court ruling, Galveston County endorses life sentences for teens*, Galveston County Daily News (May 4, 2021), https://www.galvnews.com/news/article_3164ad7d-ff87-5f24-97d5-9251c8e46aa0.html.

[20] Brooke A. Lewis, *Confederate statue in Galveston County will stay put — for now*, Houston Chronicle (Aug. 24, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/Confederate-statue-in-Galveston-County-will-stay-15511484.php.

[21] Dignified Resignation Historical Marker, Galveston.com, https://www.galveston.com/whattodo/tours/self-guided-tours/historical-markers/dignified-resignation/.

redistricting vote, that meeting was held in the League City North County Annex building, rather than the Galveston County Courthouse where meetings are generally held.[22]

146.    When Commissioner Holmes made a motion to remove the Confederate monument, no other commissioner seconded. Before the meeting, County Judge Henry had said he did not support removing the monument, stating, "Where does this end? Today they're offended by these statues. Tomorrow they're offended by something else. Where's the end of this?"[23]

## COUNT 1

### Intentional Racial Discrimination in Violation of the
### Fourteenth and Fifteenth Amendments
### (All Plaintiffs against All Defendants)

147.    Plaintiffs reallege the facts set forth above.

148.    The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

## COUNT 2

### Racial Gerrymandering in Violation of the Fourteenth Amendment
### (All Plaintiffs against All Defendants)

149.    Plaintiffs reallege the facts set forth above.

150.    Race predominated in the drawing of Commissioners Court precinct lines, subordinating other redistricting criteria to race, without a compelling justification.

---

[22] John Wayne Ferguson, *Commissioners to vote on removing Confederate statue from Galveston County Courthouse*, Galveston County Daily News (Aug. 21, 2020), https://www.galvnews.com/news/article_1c1a16e7-08ee-5334-9e3f-a96ab01fe03d.html.
[23] John Wayne Ferguson, *Political Buzz: Henry says 'no' to removing Galveston's Confederate statute*, Galveston County Daily News (Aug. 16, 2017), https://www.galvnews.com/news/article_4dd6245b-6917-5b86-b756-5f3b38e8f2b7.html.

## COUNT 3

**Vote Dilution in Violation of Section 2 of the Voting Rights Act, U.S.C. § 10301 *et seq.***
**(All Plaintiffs against All Defendants)**

151.    Plaintiffs reallege the facts set forth above.

152.    Section 2 of the Voting Rights Act establishes that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race[,] color, [or membership in a language minority group]." 52 U.S.C. § 10301(a).

153.    A violation of Section 2 "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [Section 2] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

154.    The adopted Commissioners Court plan violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because under the totality of the circumstances, the Commissioners Court plan has the purpose of denying Black and Latino voters an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

155.    The adopted Commissioners Court plan violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because under the totality of the circumstances, the Commissioners Court plan has the effect of denying Black and Latino voters an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

156.     Galveston County's Black and Latino population is sufficiently large and geographically compact to allow for the creation of a single member Commissioners Court precinct in which minority voters would constitute a majority of the population and citizen voting age population.

157.     Based on previous election results, Black and Latino voters in Galveston County are politically cohesive.

158.     Anglo voters in Galveston County, who are the majority of the County, vote sufficiently as a bloc usually to defeat the candidates of choice of Black and Latino voters in the absence of a Voting Rights Act-compliant district.

159.     The totality of circumstances demonstrates that Black and Latino voters have less opportunity to participate in the political process and elect representatives of their choice.

## **PRAYER FOR RELIEF**

WHEREFORE, considering the law and facts alleged herein, Plaintiffs pray this Court grant the following relief:

1.     Enter declaratory judgment that Galveston County's adopted Commissioners Court map intentionally discriminates against Black and Latino voters in violation of the U.S. Constitution;

2.     Enter declaratory judgment that Galveston County's adopted Commissioners Court map impermissibly utilizes race in violation of the U.S. Constitution;

3.     Enter declaratory judgment that Galveston County's adopted Commissioners Court map dilutes Black and Latino voters' voting rights in violation of the Voting Rights Act;

4.     Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the adopted Commissioners' Court plan. Plaintiffs have no adequate remedy at law other than the judicial relief sought herein; and unless Defendants are enjoined from using the adopted Commissioners Court plan, Plaintiffs will be irreparably injured by the continued violation of their constitutional and statutory rights;

5.      Award attorneys' fees to Plaintiffs in accordance with 42 U.S.C. § 1988, 29 U.S.C. § 794a, 42 U.S.C. §12205, and/or any other applicable provision;

6.      Order that all costs of this action be taxed against Defendants; and

7.      Grant any additional or alternative relief to which Plaintiffs may be entitled.

Respectfully submitted this 25th day of May, 2022.

/s/    *Sarah Xiyi Chen*
**TEXAS CIVIL RIGHTS PROJECT**
Mimi M.D. Marziani
Texas Bar No. 24091906
Hani Mirza
Texas Bar No. 24083512
Joaquin Gonzalez*
Texas Bar No. 24109935
Sarah Xiyi Chen*
California Bar No. 325327
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
mimi@texascivilrightsproject.org
hani@texascivilrightsproject.org
joaquin@texascivilrightsproject.org
schen@texascivilrightsproject.org

**SOUTHERN COALITION FOR SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
1415 W. Hwy 54, Suite 101
Durham, NC 27707
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org

**WILLKIE FARR & GALLAGHER LLP**
Richard Mancino*
New York Bar No. 1852797
Michelle Anne Polizzano*
New York Bar No. 5650668
Andrew J. Silberstein*

New York Bar No. 5877998
Molly Linda Zhu*
New York Bar No. 5909353
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
mzhu@willkie.com
kgarrett@willkie.com

JoAnna Suriani*
DC Bar No. 1645212
1875 K Street, N.W.
Washington, DC 20006-1238
(202) 303-1000 (Telephone)
(202) 303-2000 (Facsimile)
jsuriani@willkie.com


**SPENCER & ASSOCIATES, PLLC**
Nickolas Spencer
Texas Bar No. 24102529
9100 Southwest Freeway, Suite 122
Houston, TX 77074
713-863-1409 (Telephone)
nas@naslegal.com

***COUNSEL FOR PLAINTIFFS***

*admitted *pro hac vice*